Filed 4/21/16  P. v. Graham CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SANKONA LOVELELTEMAL GRAHAM,<br><br>    Defendant and Appellant. | D069280<br><br><br><br>(Super. Ct. Nos. RIF1200136,<br>SWF1301022 & SWF1303458) |

APPEALS from judgments of the Superior Court of Riverside County, Albert J. Wojcik, Judge.  Affirmed as modified.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

This appeal involves three separate criminal cases. In case No. RIF1200136, Sankona Loveleltemal Graham pleaded guilty to having unlawful sexual intercourse with a minor (Pen. Code, § 261.5, subd. (c))[1] and admitted an allegation he inflicted great bodily injury during the commission of the crime (§ 12022.7, subd. (a)). In case No. SWF1301022, Graham pleaded guilty to committing assault with a deadly weapon (§ 245, subd. (a)(1)). The trial court placed him on formal probation in both cases.

In case No. SWF1303458, a jury convicted Graham of contempt of court by willfully disobeying a criminal protective order (§ 166, subd. (c)(1)) and dependent adult abuse not likely to cause great bodily injury (§ 368, subd. (c)).[2] The same day the court found Graham willfully violated his probation in case Nos. RIF1200136 and SWF1301022.

For case No. SWF1303458, the court sentenced Graham to two concurrent terms of 180 days in jail with credit for time served. For case No. SWF1301022, the court sentenced Graham to six years in prison, including a three-year term for the great bodily injury enhancement. For case No. RIF1200136, the court sentenced Graham to five years in prison to run concurrently with the sentence in case No. SWF1301022.

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

[2]    The latter offense was a lesser included offense of willfully inflicting unjustifiable physical pain and mental suffering upon an elder and dependent adult under circumstances and conditions likely to produce great bodily harm and death (§ 368, subd. (b)(1)).

2

Graham appeals. In case No. SWF1303458, he contends he was deprived of his constitutional rights to an impartial jury and equal protection of the law because of the prosecutor's discriminatory use of peremptory challenges to remove African-American jurors from the jury. He also contends he was deprived of his constitutional right to due process of law because of the court's failure to grant a mistrial after the prosecutor's untimely disclosure of evidence. In case No. SWF1301022, he contends we must strike the sentence for the great bodily injury enhancement because his guilty plea did not include an admission to the truth of a great bodily injury enhancement allegation. In case No. RIF1200136, he contends we must order the abstract of judgment corrected to accurately reflect his presentence custody credits.

The People agree with the last two points. We shall direct the court to make an appropriate modification to the judgment in case No. SWF1301022; however, we conclude there is no need to order a correction to the abstract of judgment in case No. RIF1200136 as the record shows the court has already corrected the identified clerical error. We are unpersuaded by Graham's remaining contentions and affirm the judgments.

*Case No. SWF1301022*

Graham became upset when he heard his mother on the phone ostensibly attempting to contact someone to remove him from her home.[4] He picked up a glass sugar dish and threw it at her head. It hit the back of her head and knocked her down. The two tussled on the floor. She grabbed a piece of glass and hit his head with it. Then, she got up and ran into the bedroom to call for help. As she was on the phone with 911, he pushed her into a closet and hit her body with her walker 19 times. After telling her he was going to break her hip, he positioned the walker under her hip, picked up a large rock being used as a doorstop, and hit her legs and head with it several times. The last time he struck her head she lost consciousness.

*Case No. SWF1303458*

Some months after the event underlying case No. SWF1301022, Graham was staying with his mother, who lived in a senior community. Graham was not allowed to stay there and his mother's landlord repeatedly told him to leave the property.

Graham's mother had numerous health concerns, including a bad hip. Her ability to walk was limited and she required the assistance of her live-in caregiver to bathe,

---

[3]     The evidence in case No. SWF1303458 included evidence of the conduct underlying and the resolution of case No. SWF1301022. We confine our summary to the evidence from these two cases as only the evidence from these cases is relevant to the substantive issues raised on appeal.

[4]     Graham's mother has prior convictions for theft, providing false information to a police officer, child endangerment, and domestic violence.

change clothes, prepare meals, and administer medication. Because her medication did not adequately relieve her hip pain, she sometimes smoked cocaine procured by her caregiver. (The caregiver denied providing Graham's mother with illegal drugs.)

One morning, the caregiver walked into the kitchen and announced someone had taken $20 from her purse. Graham entered the room and loudly accused his mother, who was sitting nearby on the couch, of stealing the money. He jumped on his mother with his knees, using "all [of] his body weight." She described his action as "cannonball[ing]" on her.

While on top of her, Graham placed his hands around her neck and started choking her while telling her he was going to kill her. He eventually let go of her neck, picked up her metal walker, and struck her ribs and hip with it. He then punched her two or three times in the jaw, on both sides of her face.

When his mother attempted to call 911, Graham grabbed her house phone. Around then her landlord came to her home, saw Graham, and told Graham to leave. His mother called 911 from her caregiver's cell phone as Graham packed up his belongings.

Graham's mother told the 911 dispatcher Graham hit her in the jaw twice and had previously beaten her. She claimed her ears were ringing from being hit in the head. Although Graham could be heard yelling in the background during the 911 call, he left his mother's home before the police arrived, taking the caregiver's cell phone, his mother's house phone, and his mother's cigarettes with him.

His mother and the caregiver provided separate, consistent statements to police about the altercation. The statements were corroborated by his mother's statements and

5

the observations of the health care professionals who treated her. However, both his mother and the caregiver later recanted their statements.

At trial, Graham's mother denied Graham jumped on her. Instead, she testified he sat on her lap like a baby, grabbed her braids, and moved them to the side. She also denied Graham punched her, slapped her, or hit her with the walker. She claimed she lied in her initial statements about the incident because she wanted Graham out of her home. She also claimed to be under the influence of alcohol and cocaine at the time of the incident.

The caregiver testified she heard Graham and his mother yelling at one another, but she denied seeing Graham jump on, hit, punch, or choke his mother or do anything else to endanger her. Initially, the caregiver denied making prior inconsistent statements to police, but after being confronted with an audio recording of the statements (see Discussion, pt. II, *post*), she testified she previously lied to police about the encounter because Graham's mother wanted her to lie and threatened to fire her and kick her out of their home if she did not do so.

The court took judicial notice of the fact Graham pleaded guilty in case No. SWF1301022 to violating section 245, subdivision (a)(1), by committing assault with a deadly weapon using a rock. The parties further stipulated the court issued a criminal protective order against Graham in case No. SWF1301022, which prohibited him from, among other actions, harassing, striking, threatening, assaulting, disturbing the peace of, or blocking the movements of his mother.

6

DISCUSSION

I

Graham, an African-American, contends the prosecutor in case No. SWF1303458 violated his state and federal constitutional rights to equal protection and an impartial jury by peremptorily excusing two African-American prospective jurors. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in pt. by *Johnson v. California* (2005) 545 U.S. 162, 164.) We disagree.

A

1

The court's process for conducting voir dire was to question an initial group of 18 prospective jurors, allow the parties to question them, hear any challenges for cause as to them, allow the parties to exercise any peremptory challenges as to them, and then repeat the process as needed with six additional prospective jurors at a time. The court conducted six rounds of voir dire in this manner before 12 jurors and three alternates were seated.

Prospective Juror No. 7 (Juror 7) was the first African-American prospective juror the prosecutor excused. He was in the third round of jurors questioned and the third round of jurors excused. In response to the initial, standard voir dire questions, Juror 7 stated he was single and had no children, he was a student studying biology and chemistry, and he coached wrestling and football.

7

The majority of Juror 7's voir dire consisted of short responses to group questions from the court, defense counsel, and the prosecutor. However, Juror 7 also had two extended exchanges with the prosecutor. The first exchange related to witness veracity:

"[PROSECUTOR]: Do you think every witness tells the truth every time? [¶] . . . [¶]

"[JUROR 7]: No, but for a question off of that, wouldn't you have to take what they say at face value?

"[PROSECUTOR]: What do you mean?

"[JUROR 7]: And assume that it's true?

"[PROSECUTOR]: I'm sorry, what do you mean?

"[JUROR 7]: Assume what they testify to be true.

"[PROSECUTOR]: You would assume it to be true?

"[JUROR 7]: What—aren't you suppose[] to take it as—I think the question for you, like, are you supposed to take everybody's testimony to be true or is it off of your own assumptions?

"[PROSECUTOR]: Well, the question for you is are you able to judge the credibility of that witness—

"[JUROR 7]: Okay.

"[PROSECUTOR]: —and make that determination yourself?

"[JUROR 7]: All right.

"[PROSECUTOR]: Are they telling the truth now or were they telling the truth before? Do you think you could do that?

"[JUROR 7]: Yes.

"[PROSECUTOR]: What types of things would you consider in trying to make that determination?

8

"[JUROR 7]: I would just have to take everything at face value, because they might just be nervous if they are doing like little ticks like everybody else is talking about. I'm just sitting here talking, and I'm nervous for no reason. And there's no repercussions for me, but somebody who is on the stand who might, where something or something depends on it, they might be nervous and just do all the extra little things that might make it seem like they are lying, but they are not.

"[PROSECUTOR]: Okay. Let's assume it's not just nervous ticks or someone looking down or not maintaining eye contact, but, in fact, what she testifies is, 'He didn't actually beat me. I beat myself, and I lied to police when I said he beat me[?]' Okay? Now, you've got two completely conflicting stories. What are the types of things that you would consider in determining which story is the truth?

"[JUROR 7]: Just the original situation.

"[PROSECUTOR]: Such as?

"[JUROR 7]: Um, what she first said was probably more true than what she came back to say later, after the initial age and everything is gone. So the situation would have to be how I would interpret it.

"[PROSECUTOR]: Would you consider what is more reasonable, which version of the events is more reasonable?

"[JUROR 7]: Whether he beat her or whatever the situation is.

"[PROSECUTOR]: Right. When she describes what happened the first time versus 'I punched myself,' basically.

"[JUROR 7]: Yeah.

"[PROSECUTOR]: Would you consider which one is more reasonable?

"[JUROR 7]: What happened the first time.

"[PROSECUTOR]: Okay.

"[JUROR 7]: You understand what I'm saying, anyway?

9

"[PROSECUTOR]:  I think I do, yes."

The second exchange involved witness credibility:

"[PROSECUTOR]:  Okay.  Did you all hear my hypothetical about if a witness lies about one thing and tells the truth about another, that it's up to you?  The law says it's up to you to decide whether to believe some of it, all of it, or none of it.  Anybody have any issues with that?  [¶] . . . [¶]

"[JUROR 7]:  No.

"[PROSECUTOR]:  The story about the business man on the trip, tells the police everything the truth, except for that one part about where and how it happened.  Does that mean that the crime did not occur?

"[JUROR 7]:  No.  The crime did occur.

"[PROSECUTOR]:  I'm sorry?

"[JUROR 7]:  The crime did occur.

"[PROSECUTOR]:  It did occur?

"[JUROR 7]:  Yes.

"[PROSECUTOR]:  Okay.  So if the woman who took his money and took his wallet is on trial, and you hear that businessman take the stand, and we know he's obviously a liar; right?  Because he is lying to the employee for one thing about what he's doing, but he's also lying to you as a juror about how it happened.  Your testimony or your answer a minute ago was that the crime still occurred.

"[JUROR 7]:  Yes.

"[PROSECUTOR]:  Is that right?

"[JUROR 7]:  Yes.

"[PROSECUTOR]:  And it's up to you to decide how much to believe.  How would vote in that case, assuming you believed everything else he said to be true?

10

"[JUROR 7]:  I would vote guilty if the evidence points to it."

                                    2

Prospective Juror No. 8 (Juror 8) was the second African-American prospective juror the prosecutor excused.  She remained a prospective juror longer than Juror 7.  She was in the second round of jurors questioned and the fourth round of jurors excused.

In response to the initial, standard voir dire questions, she stated she was not married, she had one child, and she was a cosmetology student and a sales representative.  She had previously served as a juror in a child molestation case and the jury had been able to reach a verdict.

Like Juror 7's voir dire, Juror 8's voir dire largely consisted of providing short responses to group questions from the court, defense counsel, and the prosecutor.  However, she had four extended exchanges with the prosecutor.  The first exchange related to the role of juror:

> "[PROSECUTOR]:  . . . The ultimate question is simply, did he do what he is charged with doing or didn't he?  [¶]  [Juror 8], do you think, knowing that, that you're asked to decide whether he's a good person or a bad person?
>
> "[JUROR 8]:  He's a good—good person.  I don't understand what you are saying.
>
> "[PROSECUTOR]:  In other words, your job as a juror—
>
> "[JUROR 8]:  Uh-huh.
>
> "[PROSECUTOR]:  —is to decide did he do it or didn't he?
>
> "[JUROR 8]:  Yes.  [¶] . . . [¶]

                                    11

"[PROSECUTOR]: The question is—or your duty is to determine, have the charges been proven beyond a reasonable doubt?

"[JUROR 8]: Okay. [¶] . . . [¶]

"[PROSECUTOR]: If you determine that the charges have been proven beyond a reasonable doubt, you have determined that he did it.

"[JUROR 8]: Yes.

"[PROSECUTOR]: If it has not been proven beyond a reasonable doubt, it's simply that I have not proven my case beyond a reasonable doubt.

"[JUROR 8]: Yes.

"[PROSECUTOR]: Okay. Is that part clear?

"[JUROR 8]: Yes.

"[PROSECUTOR]: Okay. So do you think that in determining whether the charges have been proved beyond a reasonable doubt, part of your determination is, is he a good person or a bad person?

"[JUROR 8]: I don't think he would be neither one, good or bad. I can't determine if he's a good or bad person—

"[PROSECUTOR]: Right.

"[JUROR 8]: —after that.

"[PROSECUTOR]: Right. In other words, in determining, is the proof there or isn't there, no part of that is asking you to decide whether he's a good or a bad person.

"[JUROR 8]: Yes.

"[PROSECUTOR]: Are you okay with that?

"[JUROR 8]: Yes."

The second exchange involved a discussion of the prosecution of crimes occurring

in the home:

> "[PROSECUTOR]: [Juror 8], do you think every crime happens out
> in public where there are many witnesses?
> "[JUROR 8]: No
>
> "[PROSECUTOR]: Why not?
>
> "[JUROR 8]: It's 'cause—I don't know. People do thing—things
> happen everywhere.
>
> "[PROSECUTOR]: Okay.
>
> "[JUROR 8]: I mean, it doesn't have to just be outside. It can be
> behind closed doors. It can be outside. It can be anywhere.
>
> "[PROSECUTOR]: All right. And are you okay with the idea of a
> person being prosecuted for something that some people might say is
> a family matter, something that happens just between family
> members.
>
> "[JUROR 8]: Yes.
>
> "[PROSECUTOR]: You are okay with that?
>
> "[JUROR 8]: Yes.
>
> "[PROSECUTOR]: And do you have any problems with sitting on a
> jury, where a person is charged with committing a crime against a
> family member?
>
> "[JUROR 8]: No."

The third exchange involved a discussion about determining a witness's veracity:

> "[PROSECUTOR]: [Juror 8], do you think that you would be able
> to determine whether a witness is lying about something or not?
>
> "[JUROR 8]: Yes, I could.
>
> "[PROSECUTOR]: What kinds of things would you consider?

13

"[JUROR 8]:  Um, I think consistency in the story.

"[PROSECUTOR]:  Anything else?

"[JUROR 8]:  Um―eye contact, you know, twirling of the hair.  I mean, there's a lot of things that you can pick up on.

"[PROSECUTOR]:  Just kind of their demeanor while they're testifying?

"[JUROR 8]:  Yeah.

"[PROSECUTOR]:  Would you consider whether or not what they are saying is reasonable in determining whether they might be telling the truth?

"[JUROR 8]:  Yeah.

"[PROSECUTOR]:  And, in other words, if I said that I am a prosecutor by day, but in the off season I am the starting quarterback of the San Diego Chargers, do you think I'm telling the truth or not?

"[JUROR 8]:  I don't know.  I wouldn't―

"[PROSECUTOR]:  I'll take that as a compliment.  [¶]  All right.  Well, there's a distinction that has to be drawn between something being reasonable and unreasonable, and possible versus impossible.  It's possible that I am a starting quarterback for the San Diego Chargers, I'm relatively young―I'll stop right there.  Do you think it's reasonable, though, for me to say that?

"[JUROR 8]:  Yes.

"[PROSECUTOR]:  You do?

"[JUROR 8]:  Uh-huh?

"[PROSECUTOR]:  You think I would be here right now?

"[JUROR 8]:  No, I'm sorry.  No.

14

"[PROSECUTOR]: Okay. Do you think you would be able to determine whether something that someone says is actually reasonable or not?

"[JUROR 8]: Yes."

The last exchange involved a discussion about the use of ordinary, not inherently dangerous items as a deadly weapon:

"[PROSECUTOR]: Okay. What about a sidewalk? [Juror 8], I'll give you the tricky one.

"[JUROR 8]: Picking on me. It depends. It can be.

"[PROSECUTOR]: How can it have been?

"[JUROR 8]: If somebody runs and trips or somebody pushed somebody down. Yeah, it could be."

3

After the prosecutor excused Juror 8, defense counsel made a *Batson/Wheeler* motion seeking justification for the prosecution's peremptory challenges to Jurors 7 and 8. At the time of the motion, there was one African-American on the jury and another next up to replace Juror 8.

When the court offered the prosecutor an opportunity to comment, the prosecutor first asked whether the court was making a prima facie finding of racial discrimination. The court responded, "Well, I don't know if there is or isn't, but I do know your last pre-empt, before Juror 8, was not a person who was a minority but the one before that was; so we have [an African-American] individual who was excused, and a person who is not [African-American], another [African-American] individual. Although [one African-American] has been on there for a long time, and another [African-American] who

15

is—would take the spot.  So that in mind, *I would make a finding at least to the point of requir[ing] a reason why*."  (Italics added.)

The prosecutor then explained he had no problem with the African-American already on the jury.  "I think he's just fine.  I think every time he was answering a question, he answered the question articulately.  He answered the questions intelligently.  Everything that he said in court made perfect sense.  I didn't have any difficulty communicating with him."

Conversely, regarding Juror 7, the prosecutor explained, "[He] was a very quiet person.  He mumbled.  He would not answer my question very clearly.  He specifically said [in response to questions from defense counsel], 'If I had my doubts, I would vote "not guilty," ' which is not the standard.  You can have doubts, it just has to be beyond a reasonable doubt.  And I didn't feel that when I probed to try to get more information out of him, that he was speaking clearly, that he was articulating his thoughts, that he was reserved in his answers."

The prosecutor had the same impression of Juror 8.  The prosecutor explained, "She seemed confused when I was asking her whether or not she would decide the issue of whether or not the defendant is a good person or a bad person or whether or not that would play any role in her deliberations, and I had to clarify it several times before she said, 'Oh, no, it wouldn't play a role.'  But the very first answer she gave was, 'He's a good person,' which clearly she doesn't have any evidence about that.  That's not a proper consideration.

"Additionally, she is the only person who is up there who is single and has a child. While that's not a criteria by itself, it's one more factor that I considered. She's going into cosmetology. I just did not get a good feeling that she would be the person who would actually articulately represent the viewpoints in a jury deliberation room, whereas I do get that feeling from [the African-American already on the jury] and I get that feeling from [the African-American who would be next up to replace Juror 8]. I have no desire to kick either one of them."

Defense counsel disagreed with the prosecutor's assessment. She argued the two jurors answered the questions posed to them, their answers were not inarticulate, they were both students, and they did not answer the questions any differently than the non-African-American jurors still sitting on the jury.

After hearing the prosecutor's explanations and defense counsel's arguments, the court denied defense counsel's motion. The court found, "[T]he peremptory challenges were exercised by [the prosecutor] on a neutral basis reasonably relevant to his case and with such other jurors, and, specifically, was not based upon a group or race bias. The reasons stated by [the prosecutor], [defense] counsel may not agree with the reasons, but I think are valid reasons; and there are some justification behind them, to some extent."

B

"Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias. (*Batson, supra*, 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 276-277.) The now familiar *Batson*/*Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima

17

facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).)

Here, the court at least implicitly found Graham had established a prima facie case of racial discrimination. We, therefore, proceed to the third step of the *Batson/Wheeler* inquiry and analyze whether the court properly accepted the prosecutor's race neutral reasons. (*Scott*, *supra*, 61 Cal.4th at p. 387, fn. 1; *People v. Hensley* (2014) 59 Cal.4th 788, 802 (*Hensley*); *People v. Sattiewhite* (2014) 59 Cal.4th 446, 469; *People v. Mai* (2013) 57 Cal.4th 986, 1049-1050.)

We focus our inquiry " 'on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons.' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1317.) "A peremptory challenge may be based on employment [citation], and ' "hunches[,]" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias' [citation]. The basis for a challenge may range from 'the virtually certain to the highly speculative' [citation] and 'even a "trivial" reason, if genuine and neutral, will suffice.' " (*Id*. at p. 1316.)

18

Our " ' "[r]eview of a trial court's denial of a [*Batson*/*Wheeler*] motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " ' [Citation.] 'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.' " (*Hensley*, *supra*, 59 Cal.4th at pp. 802-803.)

Here, the prosecutor stated reasons for challenging Juror 7 were his reservedness, his tendency to mumble his responses, and his difficulty clearly articulating his thoughts. These reasons are race-neutral, inherently plausible and, to the extent they can be assessed by reviewing transcripts, supported by the record. In his first exchange with the prosecutor, Juror 7 admitted to being nervous for no reason and, in both exchanges, he appeared to have trouble understanding and coherently responding to the prosecutor's questions.

The prosecutor stated reasons for challenging Juror 8 were her difficulty in understanding and clearly responding to questions, her status as a single parent, her status as a cosmetology student, and his general sense she would not be able to articulately

19

represent her views in the jury room. As with the prosecutor's stated reasons for challenging Juror 7, these reasons are race-neutral, inherently plausible, and supported by the record. Particularly supportive were Juror 8's responses to questions about the reasonableness of the prosecutor's claim of being a professional football player and whether a sidewalk could be used as a deadly weapon as these responses reflect a tendency to conform her views to perceived expectations rather than the exercise of her independent judgment. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 109 (*DeHoyos*) [a juror's responses and demeanor suggesting an inability to independently reach a judgment on the issues is a permissible race-neutral ground for a peremptory challenge].)

A comparative juror analysis does not aid Graham's position because the record fails to show that any seated or alternate juror possessed the same combination of characteristics prompting the prosecution's challenges to Juror 7 and Juror 8. "In order for a comparison to be probative, jurors need not be identical in all respects [citation], but they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge." (*DeHoyos*, *supra*, 57 Cal.4th at p. 107; *People v. Harris* (2013) 57 Cal.4th 804, 836-837.) Accordingly, we conclude there is substantial evidence to support the court's decision to deny Graham's *Batson/Wheeler* motion.

II

A

The evening between the caregiver's testimony and the investigating officer's testimony, the prosecutor learned for the first time there was an audio recording of the investigating officer's interview with the caregiver. The prosecutor immediately notified

20

defense counsel of the recording and he provided her with a copy of it the following morning. After listening to the recording, defense counsel moved for a mistrial, arguing the late disclosure of the recording prejudiced her ability to adequately prepare Graham's defense. As support for her position, she noted the recording contained a substantial amount of new information, including not just the caregiver's statements to the investigating officer, but also Graham's mother's statements to the investigating officer. Had the recording been available to her earlier, she asserted she would have had her investigator question the witnesses about their prior inconsistent statements and possibly altered her trial tactics based on their responses.

The prosecutor pointed out the witnesses' prior inconsistent statements were already going to come into evidence through the investigating officer's testimony. Nonetheless, he recognized there had been a discovery violation, and he argued the appropriate remedy for it was a continuance to allow defense counsel to process the new information.

The court agreed with the prosecution. The court denied defense counsel's request for a mistrial, but granted her a brief continuance of approximately a half day to process the new information. The audio recording was subsequently played for the jury during the testimony of the investigating officer. Defense counsel later recalled the caregiver as a witness, who testified she had lied to the investigating officer at the behest of Graham's mother.

The court also instructed the jury with the following tailored version of CALJIC No. 2.28: "The prosecution and the defense are required to disclose to each other before

21

trial the evidence each intend[s] to present at trial so as to promote the ascertainment of the truth, save court time and avoid any surprise which may arise during the course of the trial. Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence.

"Disclosure[s] of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the People failed to timely disclose the following evidence: Audio of interviews with [the caregiver and Graham's mother].

"Although the People's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial. [¶] If you find that the delayed disclosure was by the prosecution, and relates to a fact of importance rather than something trivial, and does not relate to a subject matter already established by other credible evidence, you may consider that delayed disclosure in determining the believability or weight to be given to that particular evidence."

B

Graham contends the court's failure to grant his request for a mistrial deprived him of his constitutional right to due process of law. We are unpersuaded by this contention.

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in

22

the possession of the investigating agencies." ' [Citation.] Evidence subject to disclosure includes '[s]tatements of all defendants' (§ 1054.1, subd. (b)), '[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged' (*id.*, subd. (c)), any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts' (*id.*, subd. (f)), and '[a]ny exculpatory evidence' (*id.*, subd. (e)). 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. (§ 1054.7.)' [Citation.]

"Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but not limited to, immediate disclosure, . . . continuance of the matter, or any other lawful order.' (§ 1054.5, subd. (b).) The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' (*Ibid*.) A violation of section 1054.1 is subject to the harmless-error standard set forth in . . . *Watson[, supra,]* 46 Cal.2d [at page] 836." (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280 (*Verdugo*).)

In this case, defense counsel knew before trial Graham's mother and her caregiver had recanted their statements to the investigating officer. Defense counsel also knew the officer would be testifying to their prior statements. Defense counsel learned of the audio recording of the statements before the investigating officer testified. The court granted defense counsel a brief continuance to prepare for the officer's cross-examination. Both

23

Graham's mother and the caregiver testified they lied to the officer and offered a facially plausible explanation for why they did so: Graham's mother to get Graham out of her home and the caregiver because she was threatened with the loss of her job and home. The investigating officer admitted he failed to book the audio recording into evidence and the court instructed the jury it could draw an adverse inference from the delayed discovery. Although Graham states generally the delay adversely affected defense counsel's preparations, he does not specifically explain what his counsel would have done differently absent the delay. Accordingly, he has not demonstrated the delay prejudiced him. (See *Verdugo*, *supra*, 50 Cal.4th at pp. 281-282.)

### III

The court's sentence in case No. SWF1301022 included a three-year term for a great bodily injury enhancement. However, Graham's guilty plea in this case did not include an admission to the truth of a great bodily injury enhancement allegation.

Graham contends, the People concede, and we agree we must modify the sentence to strike the term for the great bodily injury enhancement. This portion of the sentence was unauthorized because it could not be legally imposed (*People v. Anderson* (2010) 50 Cal.4th 19, 26), and we have the power to correct an unauthorized sentence at any time. (§ 1260; *People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13.)

### IV

When the court orally pronounced the sentence in case No. RIF1200136, the court did not pronounce an award of presentence custody credit. Nonetheless, the court stated it would impose all terms suggested and recommended in the probation report. The

probation report recommended the court award 508 days of presentence custody credit, consisting of 442 days of actual custody credit and 66 days of conduct credit, and the minute order from the sentencing hearing indicates the court awarded presentence custody credit in these amounts.  However, the abstract of judgment filed November 18, 2014, mistakenly states the court awarded only 422 days of actual custody credit.

Graham contends and the People agree we should direct the court to correct this clerical error.  While we have the power to order such a correction (*People v. Mitchell* (2001) 26 Cal.4th 181, 185), we need not exercise our power in this instance as the record shows the court already corrected the error in an abstract of judgment filed December 29, 2014, following the receipt of a letter from the Department of Corrections and Rehabilitation.

## DISPOSITION

In case Nos. SWF1303458 and RIF1200136, the judgments are affirmed.  In case No. SWF1301022, the judgment is modified to strike the three-year sentence for the great bodily injury enhancement.  The trial court is directed to amend the abstract of judgment to reflect this modification and to forward a copy of the amended abstract to the

Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

MCCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

AARON, J.